Jeffrey D. Kaliel (CA Bar No. 238293)
Sophia Gold (pending *pro hac vice*)
**KALIEL PLLC**
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C.  20009
(202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

Edward Kilpela (CO Bar No. 42927)
Todd D. Carpenter (pending *pro hac vice*)
Brittany C. Casola (pending *pro hac vice*)
**CARLSON LYNCH SWEET**
**KILPELA & CARPENTER, LLP**
1350 Columbia Street, Suite 603
San Diego, California 92101
Telephone: (619) 762-1900
Facsimile: (619) 756-6991
ekilpela@carlsonlynch.com
tcarpenter@carlsonlynch.com
bcasola@carlsonlynch.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

| | |
|---|---|
| VICTORIA FLORES,<br>on behalf of herself and all others similarly situated,<br><br>     Plaintiff,<br> v.<br><br>BANK OF AMERICA, N.A.,<br><br>     Defendant. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**CASE NO.** _____ |

## CLASS ACTION COMPLAINT

Plaintiff Victoria Flores ("Plaintiff"), on behalf of herself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations.

## INTRODUCTION

1. The rule of law means contract terms are not changed in the dark, unilaterally, and foisted on unknowing parties. Consent is the guiding light of our entire common law system. *Robinson v. Onstar, LLC*, No. 16-56412, 2018 WL 2015479 (9th Cir. Mar. 15, 2018).

2. Plaintiff Victoria Flores is a Bank of America, N.A. ("BofA") accountholder who entered into a contract for a free checking account—that is, an account *without* monthly maintenance fees.

3. After several years, BofA unilaterally altered the essential terms of the agreement between itself and Plaintiff, and thousands of other accountholders, for the provision of checking account services, and began assessing a $12 per month service charge—or $144 per year. The name of the expensive plan that BofA unilaterally placed the Plaintiff and other accountholders in is called a Core Checking Account.

4. Basic contract law and Colorado's consumer protection laws bar BofA from unilaterally altering an essential contract term, such that the original contract is unrecognizable. That is exactly what BofA did here.

5. BofA used two additional tactics to ensure consumers were enrolled in the $144 per year Core Checking Account: it took measures to ensure that the supposed notice was not effective; and it exerted duress to ensure consumers did not leave the bank.

6.  While it is within BofA's rights to cease offering a product like free checking accounts, and to set the prices of its products, it is not within BofA's right to *default* people into a totally different, expensive product without affirmative consent.

7.  With this action, Plaintiff seeks an injunction requiring BofA to provide a fair, transparent process by which it notifies consumers; allows them to choose to opt in to a $144 per year Core Checking Account, another BofA product, or close their accounts in an orderly fashion. Plaintiff also seeks a refund of the monthly service charges paid by consumers who were charged for Core Checking Accounts prior to receiving appropriate notice and choice.

## JURISDICTION AND VENUE

8.  This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than BofA.

9.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because BofA is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## PARTIES

10. Plaintiff is a citizen of Colorado and resides in Denver, Colorado. Plaintiff had a free eBanking checking account at BofA until BofA unilaterally closed that account and put her in a Core Checking Account that costs $12 per month, or $144 per year.

11. Defendant BofA is a national bank with its headquarters and principal place of business located in Charlotte, North Carolina. Among other things, BofA is engaged in the

business of providing retail banking services to consumers, including Plaintiff and members of the putative class.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### I. BOFA HAS OFFERED THE EBANKING ACCOUNT FOR SEVERAL YEARS

12. Plaintiff, like thousands of other accountholders, for several years had an "eBanking Checking Account" with BofA. That account offered a free checking account for consumers who did not go to an in-person teller and agreed to get their statements online instead of in the mail.

13. This allowed lower-income Americans to access BofA's services.

14. Without affirmative consent from Plaintiff and other consumers, BofA closed the eBanking checking accounts and opened new accounts for consumers. The new accounts, called Core Checking Accounts, cost $144 per year, unless consumers keep their balance above $1,500, or have direct deposits of $250 or more per month—requirements that are out of reach for many Americans.

15. The Lawyers' Committee for Civil Rights Under Law, a group that targets societal inequality, issued a statement that said low-income people who are denied traditional bank services "are now left vulnerable to costly check-cashing outlets, pawnshops, and other predatory services."

### II. BOFA DEFAULTED ACCOUNTHOLDERS INTO A $144 A YEAR CHECKING ACCOUNT WITHOUT AFFIRMATIVE CONSENT

16. BofA closed Plaintiff's eBanking account in January, 2018, and—without her affirmative consent—enrolled her in a new "Core Checking" Account, at a cost of $144 per year.

17. Plaintiff never chose to enroll in the Core Checking Account.

18. BofA opted her into the account without her knowledge or consent.

19. A large amount of academic research has found that the power of "defaults"—of opting-people in to a decision they otherwise would not make—is extraordinary.

20. As Professor Cass Sunstein has written,

> A great deal of research explores exactly why default rules have such a large effect on outcomes. There appear to be three principal contributing factors. The first involves inertia and procrastination (sometimes described as "effort" or an "effort tax"). To change the default rule, people must make an active choice to reject that rule. They have to focus on and answer the relevant question—whether they should be enrolled in a savings plan, or whether they should have green energy, or whether they would gain or lose from a privacy policy, or whether they should give a particular tip. Especially (but not only) if the question is difficult or technical, it is tempting to defer the decision or not to make it at all. In view of the power of inertia and the tendency to procrastinate, people may simply continue with the status quo.
>
> […]
>
> The second factor involves what people might see as an "implicit endorsement" of the default rule. If choice architects have explicitly chosen that rule, people may believe that they have been given an implicit recommendation, and that they should not depart from it unless they have private information that would justify a change. Suppose, for example, that the default choice is green energy, or that a public or private employer automatically enrolls employees into a particular pension plan. It is tempting to think that experts, or sensible people, believe that these are the right courses of action. Those who are deciding whether to opt out might trust the choice architects well enough to follow their lead. Many people appear to think that the default was chosen by someone sensible and for a good reason. Especially if they lack experience or expertise, they might simply defer to what has been chosen for them.
>
> […]
>
> The default rule helps to establish the "reference point" for people's decisions. Consider in this regard the behavioral finding of loss aversion. People dislike losses far more than they like corresponding gains, and whether a loss or a gain is involved does not come from nature or from the sky. The default rule determines what counts as a loss and what counts as a gain.

21. Bank of America exploited the power of defaults in January 2018 by moving people who had previously enjoyed free checking accounts into a $144 per year checking account without their affirmative consent.

### III.   THE BANK CHOSE A NOTIFICATION OPTION THAT IT KNEW WOULD GO UNSEEN

22.   Worse, and in order to maximize the power of default, BofA did not provide adequate, prominent notice of its change.

23.   The only notice BofA purports to have sent to Plaintiff and the Class was a notice at the back of a several-page monthly statement at the end of 2017.

24.   BofA chose this method intentionally, for many reasons, because it knew few people would be able or likely to see this notification.

25.   First, the notice was placed on the very last page of the statement, well after actual banking details—the information consumers actually care about—were provided.

26.   Second, eBanking accountholders were required to receive all statements electronically.  That means accountholders never received any *written*, mailed notice of their account closure.

27.   Instead, consumers would have had to scroll the end of a several-page electronic document to see any notification whatsoever of their account closure.

28.   Moreover—and as BofA is well aware—many of the low-income consumers who were enrolled in the eBanking accounts do not have regular access to computers.  BofA knows low income people generally use their phones, if they have digital access at all, for all banking needs, instead of a separate laptop.

29.   Instead, many use mobile devices to perform banking functions and to read statements.  However, the statements are even more difficult to read on smaller, mobile devices.

30.   This process was designed to ensure few people understood their accounts would be closed, and to ensure that few accountholders could arrange for alternative banking options. In short, the inconspicuous "notice" was designed to maximize BofA's power of default—and to

ensure the vast majority of consumers began paying for the new $144 per year checking accounts via automatic deduction.

### IV. IN THE ABSENCE OF AFFIRMATIVE CONSENT, THE BANK WAS NOT AUTHORIZED TO DEDUCT FEES FOR THE CORE CHECKING ACCOUNT

31. The Core Checking Account into which Plaintiff was enrolled was an entirely different account with entirely different features. This was not merely a change of minor terms in the deposit agreement—this was the closure and reopening of an entirely different account, all without consent.

32. Worse, BofA began automatically deducting $12 per month from consumers' accounts—knowing full well that, like Plaintiff, consumers would not notice the small deductions immediately.

33. Because Plaintiff did not consent to the deduction of such fees, and because she was not adequately informed of them, BofA was not authorized to deduct the fees automatically.

### V. THE COURT SHOULD REQUIRE BofA TO PROPERLY RECEIVE CONSENT FROM ACCOUNTHOLDERS TO OPEN NEW ACCOUNTS IN THEIR NAME AND TO CHARGE $144 PER YEAR

34. BofA could have easily given consumers two options, one of which they had to affirmatively select: enroll in the new $144 per year account; or have their account closed and balances paid to consumers via check or any other method.

35. Instead, BofA counted on its built-in advantages of default to keep people locked into BofA and paying the new $144 per year fee.

36. Until persons knowingly made the choice to stay (or to leave), BofA was not authorized to begin deducting $144 per year in fees.

37. BofA could easily have designed an "opt-in" process. It is the same process it uses with its overdraft protection services. It intentionally chose to put the onus on consumers to opt *out*.

38. With this lawsuit, Plaintiff does not claim she is entitled to a lifetime of free checking because she entered into an initial contract for one. She does, however, dispute that the *process* BofA chose to close her old account and enroll her in a new one was unfair and deceptive.

39. The manner in which the switch was rolled out was designed to put maximum pressure on low income people.

40. BofA made an affirmative policy choice to force people to opt *out* of its new $144 per year account. The reason is simple: it wanted to make it as difficult as possible for consumers to leave BofA.

41. Those difficulties came in many forms. First, it is notoriously difficult to change bank accounts. Direct deposits must be changed and recurring debits must be updated.

42. But more fundamentally, many people with troubled credit or a history of overdraft fees may be unable to open checking accounts elsewhere.

43. These burdens make it especially important that full and fair and orderly process allows people find all options before BofA's $144 per year fee began being automatically deducted from consumers' accounts.

44. BofA was required to notify consumers their accounts would be closed, then allow consumers to explore options.

45. It was not allowed to exploit its advantages to exert pressure on consumers to resign themselves to staying for an expensive checking account product.

## CLASS ALLEGATIONS

46.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

47.     The proposed Class is defined as:

> All Bank of America eBanking checking accountholders in the United States who, during the applicable statute of limitations, were placed in a Core Checking Account and charged a monthly maintenance fee (the "National Class").

The proposed Subclass is defined as:

> All Bank of America eBanking checking accountholders in Colorado who, during the applicable statute of limitations, were placed in a Core Checking Account and charged a monthly maintenance fee (the "Colorado Class").

48.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

49.     Excluded from the Classes are BofA, its parents, subsidiaries, affiliates, officers and directors, any entity in which BofA has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

50.     The members of the Class are so numerous that joinder is impractical.  The Class consists of thousands of members, the identity of whom is within the knowledge of and can be ascertained from BofA's records.

51.     The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all Class members, was improperly placed in a Core Checking Account and assess monthly maintenance fees of $12. The representative Plaintiff, like

all Class members, has been damaged by BofA's misconduct in that she has been assessed improper fees. Furthermore, the factual basis of BofA's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

52. There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

53. Among the questions of law and fact common to the Class are whether BofA:

   a. Improperly placed eBanking checking accountholders into Core Checking Accounts and assessed them $12 per month maintenance fees; and

   b. The proper method or methods by which to measure damages.

54. Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same wrongful conduct by BofA. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

55. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

56. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of BofA, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and BofA's misconduct will proceed without remedy.

57. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## FIRST CLAIM FOR RELIEF
### Breach of Contract
**(On Behalf of the Classes)**

58. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

59. Plaintiff and BofA have contracted for checking account services, as embodied in BofA's Deposit Agreement and related form documents.

60. No contract provision authorizes BofA to unilaterally close Plaintiff and the Class's eBanking checking accounts and unilaterally place them in Core Checking Accounts and assess them monthly maintenance fees of $12 without the appropriate notice or an "opt-in" procedure.

61. Therefore, BofA breached the terms of its Deposit Agreement by unilaterally closing Plaintiff and the Class's eBanking checking accounts and unilaterally placing them in Core Checking Accounts and assessing them monthly maintenance fees of $12 without the appropriate notice or an "opt-in" procedure.

62. Plaintiff and members of the Class have performed the obligations imposed on them under the Deposit Agreement.

63. Plaintiff and members of the Class have sustained damages as a result of BofA's breaches of the Deposit Agreement.

## SECOND CLAIM FOR RELIEF
### Breach of the Covenant of Good Faith and Fair Dealing
**(On Behalf of the Classes)**

64. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

65. Under the law of California, good faith is an element of every contract pertaining to checking accounts. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

66. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

67. BofA has breached the covenant of good faith and fair dealing in the contract through its conduct as alleged in the Complaint.

68. BofA harms consumers by abusing its contractual discretion in a number of ways which no reasonable consumer would anticipate.

69. BofA abused its contractual discretion by unilaterally closing Plaintiff and the Class's eBanking checking accounts and unilaterally placing them in Core Checking Accounts and assessing them monthly maintenance fees of $12 without the appropriate notice or an "opt-in" procedure.

70. Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the account documents.

71. Plaintiff and members of the Class have sustained damages as a result of BofA's breach of the covenant of good faith and fair dealing.

### THIRD CLAIM FOR RELIEF
### Violation of Colorado Consumer Protection Statute
### Colo. Rev. Stat. § 6-1-101, et seq
### (On Behalf of the Colorado Class)

72. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

73. BoA's conduct, as described herein, constitutes an unfair and deceptive trade practice, as defined in Colo. Rev. Stat. § 6-1-105. Specifically, BofA, *inter alia*, falsely represented to consumers that they were signing up for *free* eBanking checking accounts, and then automatically placed consumers into Core Checking Accounts and assessed them monthly maintenance fees; failed to disclose material information to consumers concerning how to avoid the monthly maintenance fees and how to close their accounts; and unfairly opted consumers into a Core Checking account with a monthly maintenance fee which consumers never signed up for and never consented to.

74. BoA's unlawful conduct occurred, and continues to occur, in the course of BoA's business.

75. As an actual and proximate result of Defendant's misconduct, Plaintiff and the Class were injured and suffered damages by BoA's conduct, including by paying monthly maintenance fees.

76. BoA is liable to Plaintiff and the Class for damages in amounts to be proven at trial, including attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF
### Conversion
### (On Behalf of the Classes)

77. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

78. BofA had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

79. BofA has wrongfully collected monthly maintenance fees from Plaintiff and the members of the Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

80. BofA has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the Class, without legal justification.

81. BofA continues to retain these funds unlawfully without the consent of Plaintiff or members of the Class.

82. BofA intends to permanently deprive Plaintiff and the members of the Class of these funds.

83. These funds are properly owned by Plaintiff and the members of the Class, not BofA, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the Class.

84. Plaintiff and the members of the Class are entitled to the immediate possession of these funds.

85. BofA has wrongfully converted these specific and readily identifiable funds.

86. BofA's wrongful conduct is continuing.

87. As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the Class have suffered and continue to suffer damages.

88. By reason of the foregoing, Plaintiff and the members of the Class are entitled to recover from BofA all damages and costs permitted by law, including all amounts that BofA has wrongfully converted.

### FIFTH CLAIM FOR RELIEF
### Unjust Enrichment
### (On Behalf of the Class)

89. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

90. BofA has requested, received, and retained funds from the Plaintiff and Class members under such circumstances that in equity and good conscience BofA ought not to retain those funds.

91. BofA should be required to pay or otherwise disgorge the improperly received and retained funds to the Plaintiff and Class members.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class demand a jury trial on all claims so triable and judgment as follows:

1. Declaring BofA's policies and practices to be wrongful, unfair, and unconscionable and enjoining BoA's illegal conduct;

2. Actual damages in an amount according to proof;

3. Punitive and exemplary damages;

4. Pre-judgment interest at the maximum rate permitted by applicable law;

5. Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

6. Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated: October 2, 2018

Respectfully submitted,

/s/ Jeffrey D. Kaliel
Jeffrey D. Kaliel (CA Bar No. 238293)
Sophia Gold (pending *pro hac vice*)
KALIEL PLLC
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C. 20009
(202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

Edward Kilpela (CO Bar No. 42927)
Todd D. Carpenter (pending *pro hac vice*)
Brittany C. Casola (pending *pro hac vice*)
**CARLSON LYNCH SWEET
KILPELA & CARPENTER, LLP**
1350 Columbia Street, Suite 603
San Diego, California 92101
Telephone: (619) 762-1900
Facsimile: (619) 756-6991
ekilpela@carlsonlynch.com
tcarpenter@carlsonlynch.com
bcasola@carlsonlynch.com

*Attorneys for Plaintiff and the Putative Class*