**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 18-cv-2527-WJM-KLM

VICTORIA FLORES, on behalf of herself and all others similarly situated,

      Plaintiff,

v.

BANK OF AMERICA, N.A.,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS, AND DENYING PLAINTIFF'S MOTION FOR SURREPLY AS MOOT**

---

      This is a proposed class action lawsuit between Plaintiff Victoria Flores ("Flores") and Defendant Bank of America, N.A. ("Bank of America," but sometimes referred to as "BofA" or "BOA" in the parties' papers). Flores alleges that she had a no-fee "eBanking Checking Account" account with Bank of America for several years before January 2018. In the middle of that month, Bank of America automatically enrolled her and all other eBanking account holders, allegedly without their consent, in a new "Core Checking" account with an automatically-withdrawn $12 monthly fee. Apparently she and many others paid this monthly fee unknowingly for some time thereafter.

      Invoking this Court's diversity jurisdiction, *see* 28 U.S.C. § 1332(a), Flores now sues Bank of America, on her own behalf and on behalf of a proposed nationwide class, claiming that Bank of America is liable to former eBanking account holders for these automatic withdrawals. She specifically pleads five claims for relief:

- breach of contract (Claim 1);

- breach of the covenant of good faith and fear dealing (Claim 2), sometimes referred to below as a "GFFD" claim;

- violation of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§ 6-1-101 *et seq.* (Claim 3);

- conversion (Claim 4); and

- unjust enrichment (Claim 5).

(ECF No. 1 at 11–15.)

Currently before the Court is Bank of America's Motion to Dismiss Plaintiff's Complaint and, in the Alternative, Strike Class Allegations ("Motion"). (ECF No. 8.) Also before the Court is Flores's Motion for Leave to File Surreply ("Surreply Motion"). (ECF No. 22.) The Court heard oral argument on June 7, 2019. (ECF No. 35.) For the reasons set forth below, the Court: (i) grants the Motion with prejudice as to Flores's claims for breach of contract and conversion, (ii) grants the Motion without prejudice as to Flores's claims for violation of the CCPA and unjust enrichment, (iii) denies the Motion as to Flores's claim for breach of the covenant of good faith and fair dealing to the extent Flores alleges Bank of America abused its discretion to send notice as part of a bank statement, (iv) grants the Motion with prejudice as to the remainder of Flores's GFFD claim, and (v) denies the Motion without prejudice to the extent it seeks to strike class allegations. The Court will lift the stay of discovery, but, for the time being, will limit the parties to individual (non-class) discovery, to illuminate certain issues that may be dispositive. The Court will defer class certification proceedings until the significance of that discovery has been evaluated. Finally, the Surreply Motion is denied as moot.

# I.  RULE 12(b)(6) STANDARD

## A.      General Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## B.      Documents Outside the Pleadings

The Court may consider a document outside the pleadings, even in a Rule 12(b)(6) analysis, if the document is (1) "mentioned in the complaint," (2) "central to [the] claims [at issue]," and (3) not challenged as inauthentic.  *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013).[1]

---

[1] "If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied."  *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997); *see also Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 923 (N.D. Ill. 1999) ("it

3

Flores's complaint repeatedly refers to "the agreement" between Flores and Bank of America, and sometimes more specifically to the "Deposit Agreement." (*See, e.g.*, ECF No. 1 ¶¶ 3, 31, 59, 61–63.) Bank of America therefore asks the Court to consider the 2012 and 2017 versions of its "Deposit Agreement" and "Personal Schedule of Fees," which Bank of America represents to comprise the "agreement" to which Flores refers in the complaint. (ECF No. 8 at 1–2 & n.1;[2] *see also* ECF Nos. 8-2 through 8-5.) The Court agrees that these documents are mentioned in the complaint and central to Flores's claims. In addition, Flores does not contest them as inauthentic, but instead relies upon them in her response brief. (*See, e.g.*, ECF No. 10 at 4.) Accordingly, the Court will treat those documents as part of the pleadings.

Flores's complaint also refers to what she claims to be the only notice she ever received that her eBanking account would become a Core Checking account. (ECF No. 1 ¶¶ 23, 25.) She says this notice was placed on the last page of a several-page monthly statement "at the end of 2017." (*Id.*) Bank of America accordingly asks the Court to consider a redacted version of Flores's October 2017 bank statement, which Bank of America represents to be the notice to which Flores refers. (ECF No. 8 at 2 n.1.) Flores disputes the admissibility of this document in the present circumstances, but she changes the focus from whether the document is authentic to whether she received it. She claims, by way of declaration, that she

---

would be totally wasteful to uphold a claim on the false premise created by less than complete documentation when the delayed consideration of the remaining documents would lead to dismissal of that claim").

[2] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in briefs and exhibits with unnumbered cover pages.

> was never actually provided with the statement BOA now
> relies on to prove notice and assent. Rather, BOA sent an
> email to Plaintiff telling her that she could, if she chose, go to
> BOA's website to download the statement. There is no
> evidence BOA notified Plaintiff that this particular statement
> (as opposed to the dozens of others she received during the
> five years her account was open) was somehow special and
> included binding contractual changes. Nor is there any
> evidence Plaintiff actually viewed the statement. Plaintiff
> does not recall doing so.

(ECF No. 10 at 7 (citations omitted).)

The problem with this argument is that the complaint—and, indeed, all of Flores's arguments apart from this attempt to prevent the October 2017 statement from being considered a part of the pleadings—rests on the notion that the notice *was received* but was nonetheless intentionally designed by Bank of America to be overlooked because it was given only once, and it appeared on the last page of an otherwise typical online-only monthly statement. (*See* ECF No. 1 ¶¶ 22–30; ECF No. 10 at 3, 7–9.) Thus, the argument as stated in the complaint is independent of what the notice actually says. The question raised by Flores's complaint is whether the *manner* of presenting the notice was sufficient to obtain account holders' consent, not whether the *words* of the notice were, *e.g.*, deceptive or ambiguous. In short, accepting the October 2017 statement as part of the pleadings is appropriate because Flores does not argue that it is inauthentic, nor does she claim that it alters her theory as presented in the complaint.

## II. BACKGROUND

The Court derives the following summary from the complaint and the documents the Court has agreed to consider as part of the pleadings.

### A. The Governing Contracts

Flores opened her eBanking checking account no later than 2012. (ECF No. 10

at 7.)  The monthly maintenance fee for an eBanking checking account was $8.95,

which Bank of America waived if the account holder met

> **both** of the following [conditions] during each statement
> cycle:
>
> - Use paperless statements
>
>   And
>
> - Use self-service options (such as our ATMs and Online
>   Banking, instead of a teller) for deposits and
>   withdrawals[.]

(ECF No. 8-3 at 4 (formatting in original).)

The Deposit Agreement between Flores and Bank of America contained, among

many other things, a very broad reservation of Bank of America's right to modify the

Agreement:

> We may change this Agreement at any time.  We may add
> new terms.  We may delete or amend existing terms.  We
> may add new accounts and services and discontinue
> existing accounts or services.  We may convert existing
> accounts and services into new accounts and services.
>
> We ordinarily send you advance notice of an adverse
> change to this Agreement.  However, we may make changes
> without prior notice unless otherwise required by law.  We
> may, but do not have to, notify you of changes that we make
> for security reasons or that we believe are either beneficial
> or not adverse to you.
>
> When we change this Agreement, the then-current version of
> this Agreement supersedes all prior versions and governs
> your account.
>
> If you continue to use your account or keep it open, you are
> deemed to accept and agree to the change and are bound
> by the change.  If you do not agree with a change, you may
> close your account as provided in this Agreement.

(ECF No. 8-2 at 4.)  The Court will refer to this as the "Modification Clause."

Also relevant here is a similar clause specific to account conversions:

> We may convert your account to another type of account, revoke privileges or close your account:
>
> * * *
>
> - when we consider it appropriate or necessary to do so.
>
> If we discontinue your type of account, we may convert your account to another type of account. . . . If we convert your account, we will send you information about your new account.

(*Id.* at 19 (formatting in original).)  The Court will refer to this as the "Conversion Clause."

Supplementing the Modification Clause and Conversion Clause is language regarding Bank of America's manner of providing notice:

> When we inform you of changes affecting your rights and obligations, we do so by delivering or otherwise making a notice available to you.  In some cases, we may post a notice of a change in our banking offices or on our website.  Otherwise, we mail the notice to you at the address we currently show for your statement or, if we have agreed on this method, we provide it to you electronically.  We may provide a notice as a message on your statement or as an insert with your statement.

(*Id.* at 15.)  The Court will refer to this as the "Notice Clause."

The Deposit Agreement also contained a "Governing Law Clause":

> This Agreement, and your and our rights and obligations under this Agreement, are governed by and interpreted according to federal law and the law of the state where your account is located.  We ordinarily maintain your account at the banking center where we open your account.  However, we may transfer your account to another banking center in the same state or in a different state.

(*Id.* at 4.)  Indirectly elaborating on this clause, the Personal Schedule of Fees states:

"We have to maintain deposit accounts at one of our banking centers.  If you live in a

state where we do not have a banking center and you ask us to open a personal account for you, we currently maintain the account at one of our banking centers in Virginia." (ECF No. 8-3 at 3.)

**B.     Conversion from eBanking to Core Checking**

In October 2017, Bank of America issued to Flores an online bank statement—again, Flores was required to accept online-only statements to maintain the waiver of the $8.95 fee. On the first page of the statement, immediately underneath Flores's address, was a conspicuous notice stating, "Please see the **Important Messages - Please Read** section of your statement for important details that could impact you." (ECF No. 8-6 at 2 (boldface in original).) The statement then went on to set forth Flores's account balances and transaction history, followed by a blank page. (*Id.* at 2–5.) After the blank page was a new page with a large-type, bold heading, "Important Messages - Please Read." (*Id.* at 6.) The notice announced that, "[o]n January 19, 2018, your eBanking checking account will change to a Bank of America Core Checking® account." (*Id.*) Bank of America explained that "[a]ccount information, including your account number, checks and debit card, all remain the same," but that certain other changes would take effect, specifically:

- Financial center transactions - beginning January 19, 2018, you will no longer pay a monthly maintenance fee because you use a teller to make deposits and withdrawals. With your Core Checking account, you will be able to make unlimited deposits and withdrawals with a teller at a financial center.

- Monthly maintenance fee - a $12 monthly maintenance fee will apply to your Core Checking account beginning with your statement cycle that starts on or after January 19, 2018. However, you can avoid this fee when you meet any ONE of the requirements shown below during each monthly statement cycle. Otherwise, the $12

monthly fee will be deducted from your account.

(*Id.* (formatting in original).)  The "requirements shown below" were:

- Have at least one qualifying direct deposit of $250 or more, such as your salary, pension, Social Security or other regular monthly income, OR

- Keep a minimum daily balance of $1,500 or more in your account, OR

- Enroll in the Preferred Rewards program and qualify for the Gold, Platinum or Platinum Honors tier (waiver applies to first 4 checking accounts).

(*Id.* (formatting in original).)  The message also stated that Flores had not met any of these requirements in the previous June, July, and August, and so she "would have been charged the monthly fee" under the new rules.  (*Id.*)

Flores alleges that Bank of America "intentionally" chose to notify eBanking account holders of the upcoming change in the foregoing manner "because it knew few people would be able or likely to see this notification."  (ECF No. 1 ¶ 24.)  Elaborating, Flores alleges:

First, the notice was placed on the very last page of the statement,[3] well after actual banking details—the information consumers actually care about—were provided.

Second, eBanking accountholders were required to receive all statements electronically.  That means accountholders never received any written, mailed notice of their account closure.

Instead, consumers would have had to scroll the end of a several-page electronic document to see any notification whatsoever of their account closure.

Moreover—and as BofA is well aware—many of the low-income consumers who were enrolled in the eBanking

---

[3] The October 2017 statement shows the notice on the fifth of eight pages, but that discrepancy is immaterial for present purposes.  (*See* ECF No. 8-6.)

accounts do not have regular access to computers. BofA knows low income people generally use their phones, if they have digital access at all, for all banking needs, instead of a separate laptop.

Instead, many use mobile devices to perform banking functions and to read statements. However, the statements are even more difficult to read on smaller, mobile devices.

This process was designed to ensure few people understood their accounts would be closed, and to ensure that few accountholders could arrange for alternative banking options. In short, the inconspicuous "notice" was designed to maximize BofA's power of default—and to ensure the vast majority of consumers began paying for the new $144 per year checking accounts via automatic deduction.

(*Id.* ¶¶ 25–30.)[4]

Flores nonetheless clarifies that "it is within BofA's rights to cease offering a product like free checking accounts, and to set the prices of its products." (*Id.* ¶ 6.) Thus, she "does not claim she is entitled to a lifetime of free checking because she entered into an initial contract for one." (*Id.* ¶ 38.) Rather, she argues that "the *process* [through which] BofA chose to close her old account and enroll her in a new one was unfair and deceptive." (*Id.* (emphasis in original).)

## III. ANALYSIS

This case presents potentially significant choice-of-law questions, particularly as

---

[4] Flores's reference to "BofA's power of default" is a recurring theme in her complaint. She quotes excerpts of the writings of Prof. Cass Sunstein about "default rules" that automatically enroll people into programs unless they choose to opt-out. (*Id.* ¶¶ 19–20.) But, even for rhetorical value, Flores somewhat misunderstands Prof. Sunstein. "Default rules," in Sunstein's view, relate to *known* choices, including the knowledge that if one does nothing, the outcome will be opt-in instead of opt-out. Sunstein's point is that the natural tendency toward inaction and the implicit official endorsement of the opt-in outcome (because it is the default rule) tend to lead to higher enrollment. (*Id.*) Understood properly, "default rules" have little to do with Flores's theory, namely, that most eBanking account holders did *not* know about the changes on the horizon, nor the need to make an opt in/out decision. One cannot procrastinate an unknown choice, nor be influenced by an unknown endorsement.

between the laws of Colorado (for which Flores mainly argues) and Virginia (for which Bank of America argues). However, the Court finds that those issues are clarified by first examining Flores's claims on their merits under both states' laws. Following that analysis, the Court will address the choice of law issue.

## A.     Has Flores Adequately Pleaded a Breach of Contract Claim?

Bank of America argues that Flores has failed to state a claim for breach of contract under either Colorado or Virginia law because Flores "fails even to specify the [contractual] terms [Bank of America] purportedly violated." (ECF No. 8 at 5.) Flores responds that she

> had a contract with BOA that entitled her to a free checking account, as long as she chose to forgo certain BOA services. BOA breached that contractual promise when, without Plaintiff's assent, it unilaterally closed her account, opened a new account, then began to withdraw $144 a year from her new account automatically—and provided her no additional services in the process.
>
> Under Colorado [and Virginia] law, a modification to a contract cannot be made by unilateral fiat. Rather, it requires assent and consideration. Both are lacking. Further, the contract does not authorize BOA's conduct here. If it does, that provision is illusory and unenforceable.

(ECF No. 10 at 6 (footnotes and citations omitted).)

### 1.     The Competing Views of What Happened

Evaluating the parties' arguments requires settling on the appropriate way to view the change from eBanking to Core Checking.

Flores views eBanking as a "free checking account" with certain charges for using in-person banking services, while Core Checking necessarily costs $12/month. Flores insists that her eBanking account was "closed" and then "a new account"—the Core Checking account—was "opened," so the two accounts are fundamentally distinct.

Bank of America views eBanking as an $8.95/month checking account, with the fee waived if the account holder elects electronic statements and foregoes in-person banking services, while Core Checking is a $12/month checking account, with the fee waived if the account holder satisfies different conditions (direct deposit of $250 or more per month, or a minimum daily balance of $1,500, or enrollment in a rewards program). (ECF No. 8 at 6 n.3; ECF No. 15 at 1.)  In other words, what has changed is the amount of the monthly fee and the terms for avoiding it.  And Flores nowhere disputes, for example, that her account number remained the same before and after the transition— as the October 2017 statement said it would.  (*See* ECF No. 8-6 at 6.)

The Court agrees with Bank of America that Flores has not plausibly pled either that she had a free checking account or that it was closed and reopened as something new.  Flores has never had an unqualifiedly free checking account.  Bank of America has always imposed a fee *and* a way to avoid that fee, both in connection with her eBanking and her Core Checking accounts.  What changed in January 2018 was the amount of the fee and the avoidance conditions.

### 2.    Illusoriness & Narrowing Constructions

The Modification Clause and the Conversion Clause could not be plainer about Bank of America's authority to make a change such as the conversion of eBanking accounts to Core Checking accounts.  (*See* Part II.A, above.)  Likely for this reason, Flores argues that the Modification Clause (she does not explicitly address the Conversion Clause) grants so much discretion to Bank of America as to potentially render the contract illusory.  (ECF No. 10 at 10–11.)  She therefore encourages the Court to follow *Badie v. Bank of America*, 79 Cal. Rptr. 2d 273 (App. 1998), where the California Court of Appeal suggested that a clause similar to the Modification Clause did

not give the bank "carte blanche to make any kind of change whatsoever as long as a specified procedure is followed." *Id.* at 281. Rather, it only permitted "a modification whose general subject matter was anticipated when the contract was entered into." *Id.*[5] Flores thus insists that

> the word "conversion" cannot be so broad as to allow BOA to "convert" *free* accounts into an entirely *new category of paid* accounts. This clause may allow BOA to, for example, close Plaintiff's account and reopen it in response to suspected identity theft. It does not allow BOA to foist an entirely *new type* of checking account onto accountholders and deduct $144/year from the new accounts.

(ECF No. 10 at 11 (emphasis in original).)

Again, Flores's eBanking account was never free. It cost $8.95/month, subject to waiver conditions that Flores apparently always met. Now, Core Checking costs $12/month, subject to waiver conditions that Flores apparently has never met. If the rule of *Badie* is that a broad change-of-terms clause only permits "a modification whose general subject matter was anticipated when the contract was entered into," 79 Cal. Rptr. 2d at 281, then the change at issue in this lawsuit was permissible because Bank of America changed terms addressing matters contemplated by the Deposit Agreement (and Personal Schedule of Fees): the amount of the fee and the conditions of waiver.

But Flores's arguments are, in any event, a departure from her pleadings. To repeat, Flores "does not claim she is entitled to a lifetime of free checking because she entered into an initial contract for one." (ECF No. 1 ¶ 38.) Rather, she affirms "BofA's

---

[5] Flores treats this reasoning from *Badie* as a holding. (*See* ECF No. 10 at 11.) *Badie* is much more complicated than that. It invalidated a terms-of-service change through an elaborate—and frankly strained—argument that the word "terms" in the relevant contract was ambiguous in the context of granting the bank discretion to "change the terms," and it heavily emphasized that the change at issue was the insertion of an arbitration clause, which affects the right to a jury trial under the California Constitution. *See* 79 Cal. Rptr. 2d at 285–91.

rights to cease offering a product like free checking accounts, and to set the prices of its products." (*Id.* ¶ 6.) She only challenges "the *process* [through which] BofA chose to close her old account and enroll her in a new one was unfair and deceptive." (*Id.* (emphasis in original).) In this light, whether Bank of America has too much discretion under the Modification and/or Conversion Clauses to change account terms is beside the point because Flores *pleads* that Bank of America has the "right[]" to modify the terms of service, including eliminating "free" checking, with the only qualification being proper notice.

Nonetheless, at oral argument, Flores's counsel proposed for the first time that the Modification Clause is so broad that it renders the entire Deposit Agreement illusory and *not* salvageable through *Badie*. Thus, said counsel, Flores's contract claims may fail for lack of an enforceable contract, but she must be permitted to go forward on her CCPA, conversion, and unjust enrichment claims. For three reasons, the Court need not address this argument.

First, the implied covenant of good faith and fair dealing generally saves clauses like the Modification Clause from illusoriness. *See, e.g.*, *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1066 (S.D. Cal. 2015), *aff'd sub nom. Wiseley v. Amazon.com, Inc.*, 709 F. App'x 862 (9th Cir. 2017); *Asmus v. Pac. Bell*, 999 P.2d 71, 79 (Cal. 2000); 2 *Corbin on Contracts* § 5.28 (2019). As explained below in Part III.B.1, that duty certainly applies if Colorado law governs. Because it may turn out that Colorado law governs this dispute, there is no need to consider at this stage whether the Modification or Conversion Clauses bring down the entire Deposit Agreement as illusory.

Second, counsel's proposal was plainly something formulated while preparing for oral argument.  It was not developed in briefing and Bank of America never received an adequate opportunity to respond.

Third, the Court gathers that Flores's counsel has not thoroughly considered the potential consequences of this proposal.  Without prejudging the matter, any argument that Flores and the proposed class have been banking with Bank of America for years effectively without a contract would at least *raise* the question of whether Bank of America may counterclaim against Flores and the class under an unjust enrichment/*quantum meruit* theory.  The argument would be that the cost of providing eBanking services was a not zero, even when customers elected paperless statements and avoided in-person banking, so, in fairness, former eBanking account holders should be required to *pay* for the services Bank of America provided during the years the parties erroneously assumed they were operating under a contract.  The Court will not presume that Flores's counsel means to redirect the case into such potentially treacherous territory without a clear signal that counsel understands the possible consequences.

Accordingly, nothing about the Modification or Conversion Clauses gives rise to a breach of contract claim or, on this record, an argument against enforcement of the Deposit Agreement.

### 3. Whether Affirmative Assent Was Required

Flores's additionally argues that, under normal contract law, a party must assent to another party's proposed contractual change.  (ECF No. 10 at 6–9.)  Flores argues that assent is a fact question that cannot be resolved at this stage.  (*Id.*)

The Deposit Agreement sets forth the method for expressing assent: "If you

continue to use your account or keep it open, you are deemed to accept and agree to the change and are bound by the change."  (ECF No. 8-2 at 4.)  Accordingly, Bank of America did not breach any term of the Deposit Agreement by presuming Flores's assent when it never received from her and opt-out notice.  Rather, Bank of America acted *according to* the Deposit Agreement.  Thus, Flores pleads no breach in this regard.

       4.   <u>Whether There Was a Failure of Consideration</u>

Flores cites cases which hold that modification without consideration is ineffective.  (ECF No. 10 at 9.)  *See, e.g.*, *H. & W. Paving Co. v. Asphalt Paving Co.*, 364 P.2d 185, 186 (Colo. 1961); *Hoagland v. Celebrity Homes, Inc.*, 572 P.2d 493, 494 (Colo. App. 1977).  But Flores betrays her understanding of the consideration she received as follows: "[I]t is difficult to fathom what consideration could possibly exist for the modification.  Under the new contract, Plaintiff was entitled to receive the exact same service as before—a checking account—only now she had to pay $144 [per year] for it."  (ECF No. 10 at 9.)  Not so.  Bank of America has now lifted all restrictions on in-person banking and paper bank statements.  Thus, it has *not* given nothing in return for increasing the monthly fee from $8.95 to $12.  To the extent consideration is required, this is enough.  *See, e.g.*, *Restatement (Second) of Contracts* §§ 71, 79 (1981).

In sum, the pleadings and other documents to which the Court may refer at this stage show that Bank of America acted according to the relevant contracts, not in violation of them.  Flores's breach of contract claim will be dismissed with prejudice.

**B.      Has Flores Adequately Pleaded a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing?**

   1.      The Potential Difference Between Colorado and Virginia

Colorado unambiguously recognizes GFFD claims. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). Virginia law is less clear. In one case, the Virginia Supreme Court seems to say that Virginia simply does not recognize a GFFD claim: "[I]n Virginia, when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights." *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 493 S.E.2d 516, 520 (Va. 1997). However, the court goes on to say, "Generally, such a covenant cannot be the vehicle for rewriting an unambiguous contract in order to create duties that do not otherwise exist." *Id.* Perhaps, then, the court only meant to express—in unusually forceful language—the fairly common principle that the covenant of good faith and fair dealing "will not contradict terms or conditions for which a party has bargained." *Amoco Oil*, 908 P.2d at 498.

The Fourth Circuit and Virginia's federal district courts have generally ignored the strong language in *Ward's Equipment*. Those courts exclusively cite their own decisions or generic treatises for the proposition that the covenant of good faith and fair dealing is actionable under Virginia law. *See, e.g.*, *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir. 1998) ("it is a basic principle of contract law in Virginia, as elsewhere, that although the duty of good faith does not prevent a party from exercising its explicit contractual *rights*, a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party"

(emphasis in original)).[6]  Nonetheless, while the Court fully understands how odd it would be to find an American jurisdiction that does not recognize the covenant of good faith and fair dealing, the Virginia Supreme Court's word is what binds federal courts sitting in diversity and applying Virginia law.  *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002) ("[w]hen the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court").

Thus, the choice-of-law decision is potentially significant.

2.    Flores's GFFD Theories

Assuming Colorado law governs,

> [t]he duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time.  The covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party.

*Amoco Oil*, 908 P.2d at 498 (citations omitted).  If federal decisions accurately state Virginia law despite *Ward's Equipment*, the Court sees no different or extra requirements under Virginia law.  In this light, the Court finds that two of Flores's GFFD theories fail, but a third states a viable claim.

---

[6] *Virginia Vermiculite* claimed that "the Virginia courts have already ruled . . . that a nearly identical contractual provision [to the one at issue in that case] carries with it an implicit duty of good faith."  *Id.*  The prior case was a trial court decision, *Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98 (1993), which declared, "[I]t has been held in Virginia that every contract contains within it an implied duty of good faith and fair dealing."  *Id.* at *3.  This assertion was obviously crafted carefully—"held *in* Virginia," not held *by* a Virginia court—as shown by the cases it cites in support: a decision from the Fourth Circuit and a decision from the Eastern District of Virginia.  *See A & E Supply Co., Inc. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 676 (4th Cir. 1986); *Pa. Life Ins. Co. v. Bumbrey*, 665 F. Supp. 1190, 1195 (E.D. Va. 1987).  The *A & E Supply* case relies on the *Restatement (Second) of Contracts.*  798 F.2d at 676.  The *Bumbrey* case relies on *A & E Supply* and another Fourth Circuit decision that cites only the *Restatement.*  665 F. Supp. at 1195.

a. *Electronic-Only Notice*

Flores attacks the electronic-only nature of the notice.  (ECF No. 1 ¶¶ 26–29.)  In her view, this is not only *per se* unreasonable, but insidious because the low-income customers who were likely to have eBanking often could access electronic materials only through their phones, making electronic statements "even more difficult to read."  (*Id.* ¶¶ 28–29.)

This argument implicates the Notice Clause, particularly where it says "we mail the notice to you at the address we currently show for your statement or, if we have agreed on this method, we provide it to you electronically."  (ECF No. 8-2 at 15.)  This portion of the Notice Clause is not "a specific contract term [that] allows for discretion."  *Amoco Oil*, 908 P.2d at 498.  The language establishes that Bank of America *will* send notices electronically "if we have agreed on this method"—and "we" means Bank of America.  (ECF No. 8-2 at 5.)

Bank of America believes it is significant that it provided Flores with "notice in the very format she requested."  (ECF No. 15 at 5.)  This focuses on Flores's election to receive statements electronically, to avoid the $8.95 fee.  This argument is misdirected.  The Notice Clause governs "notices," not "statements."  Statements are addressed separately, in a section of the Deposit Agreement titled "Statements," which immediately follows the section titled "Notices."  (ECF No. 8-2 at 15.)  The Personal Schedule of Fees says only that a customer must elect "paperless statements," not "notices."  (*See* ECF No. 8-3 at 4, 16.)

It may be true that Flores elected to receive *everything* electronically (statements, notices, tax forms, etc.), but that is not supported solely by the fact that she elected paperless statements.  Further, the Notice Clause requires Bank of America ("we") to

agree to provide notices electronically—it does not say anything about the account holder's agreement. Thus, under the Notice Clause, it is irrelevant that Flores elected to receive "statements" electronically; the relevant question is whether Bank of America "agreed" to send "notices" electronically.[7]

That said, the Notice Clause is still not a specific grant of discretion *whether* to send notices electronically. Thus, it is not a potential basis for breach of the implied covenant of good faith and fair dealing.

        b.     *Opt-Out Structure*

Flores challenges the opt-out nature of the transition to Core Checking. (ECF No. 1 ¶¶ 34, 37, 40.) Flores does not identify, nor could the Court locate, "a specific contract term [that] allows for discretion" in this regard. *Amoco Oil*, 908 P.2d at 498. The closest appears to be the final paragraph of the Modification Clause: "If you continue to use your account or keep it open, you are deemed to accept and agree to the change and are bound by the change. If you do not agree with a change, you may close your account as provided in this Agreement." (ECF No. 8-2 at 4.) But this addresses what *will* happen when Bank of America sends a change notice, not a requirement Bank of America may choose to impose. Thus, there is no discretion-granting clause on which to base a GFFD claim.

Even if the case were otherwise, Flores has not plausibly pleaded that Bank of America could have adopted an opt-in structure, considering her concession that she is not entitled to the eBanking terms indefinitely. (ECF No. ¶¶ 6, 38.) An opt-in procedure would mean that an eBanking account holder *could*, contrary to Flores's concession,

---

[7] Flores does not argue that such an agreement never happened.

maintain the eBanking terms indefinitely.

Perhaps to avoid this problem Flores suggests that "BofA could have easily given consumers two options, one of which they had to affirmatively select: enroll in the new $144 per year account; or have their account closed and balances paid to consumers via check or any other method." (*Id.* ¶ 34.) But this leads to its own problems. Flores acknowledges that many people can be lazy when faced with choices from official institutions (*id.* ¶ 20), and she nowhere alleges that Bank of America can realistically expect to receive a 100% response rate from affected account holders. At some point, then, Bank of America must be permitted to presume that the account holder made an election, but for which option?

Flores believes that presuming an intent to keep the account open under the new terms is impermissible, and so brings this lawsuit. But presuming a desire to close the account could also easily lead to litigation. Flores herself maintains that "it is notoriously difficult to change bank accounts. Direct deposits must be changed and recurring debits must be updated." (*Id.* ¶ 41.) Flores accordingly should recognize that if Bank of America closes an account and distributes the funds to an unsuspecting account holder, the change may cause direct deposits and automatic debits to fail, in turn causing financial injury to the account holder—and leading to the next lawsuit.

For all of these reasons, Flores's GFFD claim will be dismissed with prejudice to the extent she alleges that Bank of America had a choice whether to use an opt-in or opt-out procedure.

c.    *Notice Included in a Statement*

Finally, Flores asserts that it was bad faith for Bank of America to include the notice at (or toward) the end of a bank statement. (*Id.* ¶¶ 23–25.) This implicates the

Notice Clause, not the Modification Clause.  The Notice Clause says, among other

things, "We may provide a notice as a message on your statement or as an insert with

your statement."  (ECF No. 8-2 at 15.)

This appears to be discretion-granting.  At oral argument, however, Bank of

America's counsel asserted that the Notice Clause grants explicit *permission*, not

*discretion*.  In this regard, counsel directs the Court to *In re Capital One Bank Credit

Card Interest Rate Litigation*, 51 F. Supp. 3d 1316, 1345 (N.D. Ga. 2014), *as corrected*

(Nov. 3, 2014), *aff'd sub nom. Barker v. Capital One Bank (USA), N.A.*, 622 F. App'x

894 (11th Cir. 2015).  There, the bank invoked a broad change-of-terms clause,

substantially similar to the Modification Clause here, to change interest rates and credit

limits on the credit cards of over 30 million customers.  *Id.* at 1322.  Applying Virginia

law—specifically, the Fourth Circuit's interpretation of Virginia law in *Virginia

Vermiculite*—to a claim for breach of the covenant of good faith and fair dealing, the

district court stated:

> If a party has an explicit contractual right, the decision to
> exercise the right cannot be deemed "discretionary" as that
> term is used in good faith and fair dealing discussions.  If a
> party could only exercise an explicit contractual right in good
> faith, then every contractual right could be read as
> "discretionary."  [The contract in question] explicitly
> authorizes the Defendant to change any portion of [the
> contract], including annual percentage rates, at any time.
> The Court finds the discretion granted under the Agreement
> is absolute and uncontrolled and therefore even under
> *Virginia Vermiculite*, the Plaintiffs have not stated a claim for
> breach of the implied covenant of good faith and fair dealing.

*Id.* at 1345 (footnote omitted).  With respect, the Court is skeptical that "absolute and

uncontrolled" discretion under a contract exists in any jurisdiction that implies a

covenant of good faith and fair dealing—at least not without an explicit waiver of the

implied covenant (assuming such waivers are permitted).  And the worry that "every contractual right could be read as 'discretionary'" is unfounded.  Again, "[t]he covenant may be relied upon *only* when *the manner of performance under a specific contract term* allows for *discretion* on the part of either party."  *Amoco Oil*, 908 P.2d at 498 (emphasis added).

The Court agrees with counsel for Bank of America to the extent that not every contractual clause including the word "may" is a specific discretion-granting clause.  In context, a contract term saying that one party "may" do *X* or *Y* might be most reasonably interpreted as a bargained-for agreement that the other party will accept both *X* and *Y* as proper performance.  And sometimes parties use "may" when they really mean "will."  But the Notice Clause does not lend itself to either interpretation:

> When we inform you of changes affecting your rights and obligations, we do so by delivering or otherwise making a notice available to you.  In some cases, we may post a notice of a change in our banking offices or on our website.  Otherwise, we mail the notice to you at the address we currently show for your statement or, if we have agreed on this method, we provide it to you electronically.  We may provide a notice as a message on your statement or as an insert with your statement.

(ECF No. 8-2 at 15.)  Save for the difference between mailing a hard copy or sending an electronic notice, this language is infused with discretion.

Accordingly, the choice to include a notice as a message on a bank statement, allegedly because it was likely to be overlooked and therefore would allow Bank of America to collect monthly account fees before affected account holders recognized the change, is a plausible basis for a claim that Bank of America breached the covenant of good faith and fair dealing.  Bank of America's motion will be denied to this extent.

**C. Has Flores Adequately Pleaded a CCPA Claim?**

The choice-of-law question significantly affects Flores's CCPA claim because Virginia's analog to the CCPA does not apply to banks. *See* Va. Code § 59.1-199(D). But the Court need not answer the choice-of-law question at this stage because Flores thus far fails to plead a viable CCPA claim.

The Colorado Legislature enacted the CCPA "to regulate commercial activities and practices which, because of their nature, may prove injurious, offensive, or dangerous to the public. The CCPA deters and punishes businesses which commit deceptive practices in their dealings with the public by providing prompt, economical, and readily available remedies against consumer fraud." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003). The elements of a private CCPA cause of action are usually stated as follows:

> (1) that the defendant engaged in an unfair or deceptive trade practice;
>
> (2) that the challenged [unfair or deceptive] practice occurred in the course of defendant's business, vocation, or occupation;
>
> (3) that [the challenged unfair or deceptive practice] significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;
>
> (4) that the plaintiff suffered injury in fact to a legally protected interest; and
>
> (5) that the challenged practice caused the plaintiff's injury.

*Id.* at 146–47.

Bank of America argues that, although the elements are phrased in terms of "unfair or deceptive" trade practices, the case law demonstrates that there is no claim for a trade practice that is *not* deceptive but still "unfair." (ECF No. 8 at 9.) Bank of

America cites to two non-Colorado federal district court decisions that analyzed the CCPA and *Rhino Linings* and concluded that the addition of "unfair" in *Rhino Linings* must be dicta because the CCPA itself addresses itself only to "deceptive" trade practices, while the adjective "unfair" was applied for the first time, and for no discernible reason, when the Colorado Supreme Court formulated the elements in *Rhino Linings*. *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 159–60 (E.D.N.Y. 2018); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 406–08 (E.D. Pa. 2010).

The "unfair" portion actually traces to *Hall v. Walter*, 969 P.2d 224 (Colo. 1998). There, the defendants were selling rural lots and representing to buyers that the access road was over the plaintiffs' land, even though the defendants had no legal right in the plaintiffs' land to convey. *Id.* at 227–28. "As a consequence of this misrepresentation, actual and prospective purchasers used the [plaintiffs' private] road to access the [defendants' lots]," causing damage. *Id.* at 228. The plaintiffs sued for, among other things, violation of the CCPA. *Id.* The question presented to the Colorado Supreme Court was whether the plaintiffs had standing to bring a CCPA claim considering that they were not "consumers" of the defendants' land nor the target the defendants' deception, but were instead being injured by the consequences of a deception perpetrated on others. *Id.* at 230.

To answer this question, the court "f[ou]nd it helpful . . . to examine other states' interpretations of their consumer protection statutes." *Id.* at 232. The court viewed decisions from Washington state as especially helpful because of certain similarities between Washington's analogous statute. In that context, the court stated:

> In *Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Co.*, 105 Wash. 2d 778, 719 P.2d 531 (Wash. 1986), the Washington Supreme Court clarified the application of [the private right of action] by delineating the five elements required to establish a private cause of action under the Washington Act: (1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) which affects the public interest; (4) injury to the plaintiff's business or property; and (5) a causal link "between the unfair or deceptive act complained of and the injury suffered." *See Hangman Ridge*, 719 P.2d at 535. Courts have subsequently found nonconsumer standing under the Washington Act in a variety of contexts.

*Id.* at 234. The Colorado Supreme Court then announced that, "[b]ased on the CCPA's language and our prior decisions, we are persuaded that an analogous five-element standard applies in Colorado." *Id.* It therefore borrowed the Washington elements essentially wholesale, including the "unfair or deceptive" language. *Id.* at 235. *Rhino Linings* cited *Hall v. Walter* for this and the other elements. *Rhino Linings*, 62 P.3d at 146–47.

Neither *Rhino Linings* nor *Hall v. Walter* was presented with the question of whether "unfair" trade practices are proscribed independent from "deceptive" trade practices. And *Hall v. Walter*'s wholesale borrowing from the Washington Supreme Court was not entirely justified because the Washington statute explicitly condemns "unfair or deceptive acts or practices in the conduct of any trade or commerce," Wash. Rev. Code § 19.86.020, whereas the CCPA only condemns "deceptive trade practice[s]," Colo. Rev. Stat. § 6-1-105(1). Indeed, *Hall v. Walter* elsewhere seems to acknowledge as much—again, without being presented with the precise question— when it says "the CCPA requires the plaintiff to establish conduct by the defendant that constitutes a deceptive trade practice." 969 P.2d at 234 (citing § 6-1-105 and parenthetically describing it as "identifying and defining deceptive trade practices"); *cf.*

*Coors v. Sec. Life of Denver Ins. Co.*, 91 P.3d 393, 400 (Colo. App. 2003) ("a deceptive

trade practice includes only those acts identified in § 6-1-105"), *aff'd in relevant part*,

112 P.3d 59 (Colo. 2005).

All that said, "unfair or deceptive" is now thoroughly entrenched in the statement

of the CCPA's elements, and it is unclear the degree to which the Court can disregard

the Colorado Supreme Court's interpretation of Colorado law as "dicta" when the true

problem is not lack of a holding, but the inclusion within the holding of unreasoned

"extras." This Court is therefore hesitant to say that Bank of America is *correct* in its

argument that the CCPA does not reach unfair-but-not-deceptive practices.

Nonetheless, Flores's response brief entirely ignores this argument and instead seeks

to demonstrate Bank of America's alleged deceptions, without relying on any allegedly

independent unfairness. (See ECF No. 10 at 13–14.) The Court therefore deems

Flores to have conceded Bank of America's point, at least for present purposes, and the

Court will turn to whether Flores has pleaded a *deceptive* trade practice, meaning "a

false or misleading statement that induces the recipient to act or refrain from acting,

[which was] made either with knowledge of its untruth, or recklessly and willfully made

without regard to its consequences, and with an intent to mislead and deceive the

plaintiff." *Rhino Linings*, 62 P.3d at 147.

Flores says that she challenges

> the entirety of the notice process by which BOA closed
> eBanking accounts, then re-opened different accounts with
> fundamentally different terms, without informing adequately
> consumers of those terms. BOA's failure to inform
> consumers that their free accounts would be closed and
> new, paid accounts would be opened is an actionable
> omission.

(ECF No. 10 at 14.) The "entirety of the notice process" allegation facially fails the

*Rhino Linings* standard.  The accusation that "BOA's failure to inform consumers that their free accounts would be closed and new, paid accounts would be opened is an actionable omission" comes closer, but ultimately fails too.  As already addressed, this misrepresents the facts in two ways: that the accounts were closed and then reopened, and that they were free and then no longer free.  In any event, the October 2017 statement indisputably did *not* fail to inform Flores that a new monthly fee would go into effect soon along with new conditions for waiver, and that Flores would have paid the monthly fee if those conditions had been in effect on her account previously.  (ECF No. 8-6 at 6.)  In that light, the only conceivable omissions would be failure to disclose that this was a "closure" and "reopening" in some sense—but not in a sense that would matter to any account holder *but for the new terms* (which *were* disclosed).  Thus, there is no actionable deception.[8]

At oral argument, Flores's counsel repeatedly referred to Bank of America's actions as "bait and switch" tactics, likely because the CCPA explicitly prohibits "'bait and switch' advertising."  *See* Colo. Rev. Stat. § 6-1-105(1)(n).  This was not in any of Flores's filings in Bank of America never received an adequate opportunity to respond.  In any event, Flores had her eBanking account for at least five years before the alleged bait and switch.  Under the circumstances, such a bait and switch claim is implausible on its face.

More fundamentally, Flores never explains how Bank of America acted

---

[8] Even if the Court does not consider the October 2017 statement as part of the record, there are no allegations in Flores's complaint that Bank of America entirely failed to notify account holders of the new monthly fee or the new conditions for waiver, or that Bank of America misrepresented any of those matters.  It is thus unclear what would be deceptive beyond allegedly concealing this contrived closure/reopening distinction that has no practical relevance apart from the new terms and conditions.

deceptively when it only took actions that were explicitly disclosed, at least as possibilities, in the relevant contracts.

For all these reasons, Flores's CCPA claim is dismissed with prejudice to the extent she alleges "deceptive" trade practices.  However, in light of the legal uncertainty under that statute about trade practices that are "unfair" but not "deceptive," Flores's CCPA claim is dismissed without prejudice as to such "unfair" practices.  Should Flores move for leave to amend in that regard, she must provide citations to Colorado state-court case law or Colorado statutes establishing that the CCPA extends to unfair-but-not-deceptive practices.[9]

## D.      Has Flores Adequately Pleaded a Conversion Claim?

Virginia and Colorado appear to be in accord on the law of conversion.  In Colorado, "[c]onversion is any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another." *Byron v. York Inv. Co.*, 296 P.2d 742, 745 (Colo. 1956).  In Virginia, "[c]onversion is the wrongful assumption or exercise of the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights." *Economopoulos v. Kolaitis*, 528 S.E.2d 714, 719 (Va. 2000).

The consensus in American jurisdictions is that conversion claims must usually be directed at tangible property.  *See, e.g.*, *United Leasing Corp. v. Thrift Ins. Corp.*, 440 S.E.2d 902, 906 (Va. 1994) ("[i]n general, a cause of action for conversion applies

---

[9] For the first time in its reply brief, Bank of America argues that any use of the CCPA to impose disclosure requirements would be contrary to, and therefore preempted by, federal banking regulations.  (ECF No. 15 at 8.)  This prompted Flores's Surreply Motion.  (ECF No. 22.)  Because the Court is dismissing the CCPA claim on its merits, the Court need not address whether Bank of America properly raised the preemption argument for the first time in its reply brief.  The Surreply Motion is accordingly denied as moot.

only to tangible property," the exception being "intangible property rights aris[ing] from or are merged with a document, such as a valid stock certificate, promissory note, or bond"); *Johnson v. Amica Mut. Ins. Co.*, 733 A.2d 977, 978–79 (Me. 1999) (holding that "bank account funds constitute intangible, rather than tangible, property," and therefore cannot be converted; citing supporting cases from Arizona, Mississippi, Wisconsin, and the District of Rhode Island); *Virtual Cloud Servs., Inc. v. CH2M Hill, Inc.*, 2006 WL 446077, at *4 (D. Colo. Feb. 21, 2006) (assuming that Colorado law limits conversion to tangible property). Thus, generally, a conversion claim directed at money must be directed at specific bills or coins, not undifferentiated funds within an account. *Johnson*, 733 A.2d at 979; *Mack v. Nationwide Mut. Fire Ins. Co.*, 517 S.E.2d 839, 840–41 (Ga. App. 1999).

Federal courts interpreting Virginia law have extended conversion-of-money claims to those directed at "an identifiable fund," such as funds segregated in an escrow account, even though they might otherwise be considered an "intangible" ledger entry. *See Jones v. Bank of Am. Corp.*, 2010 WL 6605789, at *5 (E.D. Va. Aug. 24, 2010). This extension of conversion draws from the principle that, "[e]ven at common law, money could be converted so long as it was in a bag or chest." *Id.* (internal quotation marks omitted). Thus, it remains rooted in the idea that money is not the subject of a conversion claim unless it is a discrete sum, segregated from undifferentiated funds.[10]

---

[10] Flores emphasizes *Lloyd v. Navy Federal Credit Union*, 2018 WL 1757609 (S.D. Cal. Apr. 12, 2018), which allowed a conversion claim under Virginia law for bank account overdraft fees. Flores otherwise does not want Virginia law to apply—at a minimum, it would eliminate her CCPA claim—so it is unclear why Flores asks the Court to follow *Lloyd*. In any event, *Lloyd*'s reasoning is suspect. *Lloyd* cites cases such as *Jones*, *supra*, for the notion that conversion-of-money can extend to "identifiable funds," but then announces that the conversion claim at issue could go forward because "Plaintiffs plead specific and identifiable *sums* of money that were allegedly converted." 2018 WL 1757609, at *11 (emphasis added).

Here, Flores seeks to recover money withdrawn from an undifferentiated account. Thus, regardless of what state's law applies, this claim fails and will be dismissed with prejudice.

## E.     Has Flores Adequately Pleaded an Unjust Enrichment Claim?

The parties do not point the Court to any material distinction between Virginia and Colorado law regarding unjust enrichment. In Colorado, "a party claiming unjust enrichment must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008). In Virginia, the elements of unjust enrichment are: "(1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; and (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *R.M. Harrison Mech. Corp. v. Decker Indus., Inc.*, 75 Va. Cir. 404, at *3 (2008) (internal quotation marks omitted; emphasis removed).

Bank of America asks the Court to follow *Gordon v. Chipotle Mexican Grill, Inc.*, 344 F. Supp. 3d 1231 (D. Colo. 2018), and hold that Flores received value for her $12 monthly fee, so Bank of America cannot have been unjustly enriched. The plaintiffs in *Gordon* were all restaurant customers whose personal information was disclosed through a data breach, and they claimed unjust enrichment in the sense that Chipotle charged too much for food because what the customers paid obviously was not enough to ensure their data privacy. *Id.* at 1248. Applying Colorado law, U.S. District Judge

---

Identifiable funds and identifiable sums are not the same thing.

Christine M. Arguello dismissed the claim because "[i]t [was] undisputed that Plaintiffs received the food services for which they paid.  Defendant was therefore not unjustly enriched by retaining Plaintiffs' payments."  *Id.* at 1249.

The Court is persuaded that *Gordon* provides the correct framework.  Flores counters, however, that *Gordon* is distinguishable because she did not receive anything new: "Here, in contrast [to *Gordon*], after the unilateral account closure, [Flores] and accountholders were still receiving the *same* services as they had initially received with the free checking account, making the retention of the maintenance fees unjust under the circumstances."  (ECF No. 10 at 15 n.13 (emphasis in original).)  This argument fails for two reasons.  First, as discussed previously, Flores was not receiving the same services—whether or not she wanted to use them, in-person banking and paper statements were available to her for no extra charge under Core Checking.  Second, to say that one continues to receive the *same* services is to admit that one is *receiving services* in exchange for money.  If Flores means to say—and she never does so explicitly—that a $12 fee is somehow wildly out of proportion to the value of what a Core Checking account holder receives in return for the fee, the complaint contains no allegations substantiating such a claim.

The Court will dismiss Flores's unjust enrichment claim.  This dismissal is without prejudice, however, because the Court is not persuaded that Flores could never allege a viable unjust enrichment claim based on the $12 fee, at least in the alternative.  Flores nonetheless should carefully consider whether, as previously mentioned (Part III.A.2), pursuing such a claim potentially opens her up to an argument from Bank of America that she *underpaid* compared to the value of what she received.

**F.     Which State's Law Governs?**

The Court's analysis thus far establishes that, whether Colorado or Virginia law applies, Flores has only adequately pleaded one claim: breach of the covenant of good faith and fair dealing.  The Court has also dismissed her CCPA and unjust enrichment claims without prejudice.  The choice between Colorado and Virginia law is potentially significant as to the GFFD claim because, as noted (Part III.B.1), there is a fair argument that Virginia does not recognize such a claim.  To the extent Flores later successfully pleads a CCPA claim, the choice between Colorado and Virginia is again significant, because Virginia's analogous statute does not apply to banks (Part III.C).  The Court therefore cannot avoid the choice-of-law question.  However, in the present posture, the Court need only analyze the question in the context of the GFFD claim.

"As this court is sitting in diversity, . . . Colorado choice of law principles must be applied in the present case." *Power Motive Corp. v. Mannesmann Demag Corp.*, 617 F. Supp. 1048, 1049 (D. Colo. 1985).  When faced with a contractual choice-of-law clause, Colorado courts ask whether there is a reasonable basis for the chosen state's law, and whether applying the chosen state's law would be contrary to a fundamental Colorado policy.  *See, e.g.*, *Target Corp. v. Prestige Maint. USA, Ltd.*, 351 P.3d 493, 497 (Colo. App. 2013); *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 113 (Colo. App. 1994).  If a reasonable basis exists and no fundamental policy will be offended, the choice-of-law clause will be enforced.

In relevant part, the Governing Law Clause states: "This Agreement, and your and our rights and obligations under this Agreement, are governed by and interpreted according to . . . the law of the state where your account is located."  (ECF No. 8-2 at 4.)  Flores raises no reasonable-basis or fundamental-policy disputes as to her GFFD claim.

33

Accordingly, "the law of the state where [Flores's] account is located" will govern.

But what state is that? Bank of America says that it is Virginia. (ECF No. 8 at 4–5.) Its argument is as follows:

- The Personal Schedule of Fees states, "If you live in a state where we do not have a banking center and you ask us to open a personal account for you, we currently maintain the account at one of our banking centers in Virginia." (ECF No. 8-3 at 3.)

- Bank of America "did not have a financial center in Colorado when [Flores] opened her checking account in 2012." (ECF No. 8 at 5.) This is an outside-the-pleadings assertion, but Flores does not object to it.

- Therefore, Flores's account is maintained at a banking center in Virginia. (*Id.*)

Flores responds by emphasizing that the Governing Law Clause refers to "the law of the state where your account is [present tense] located." (ECF No. 10 at 4.) She asserts—also outside the pleadings—that (i) Bank of America now has Colorado branches and (ii) when eBanking accounts became Core Checking accounts in January 2018, the eBanking accounts were "closed" and the Core Checking accounts were newly "opened" as of that date, meaning her "new [C]ore [C]hecking account is therefore 'located' in Colorado under the terms of the [Deposit Agreement]." (*Id.* at 4 n.2.)

Bank of America replies that Flores's account was never closed and reopened (ECF No. 15 at 7)—and the Court agrees, for the reasons already stated (Part III.A.1). However, that only means that Flores has not demonstrated that her account "is

located" in Colorado now by virtue of purported closure and reopening.  It does *not* mean that her account "is [still] located" *in Virginia*.  For numerous reasons currently outside the record, Bank of America could have transferred her account away from Virginia—including to Colorado, but perhaps to some other state.

Thus, on the record before the Court, it cannot resolve the choice-of-law question.  Discovery on this issue is required.

## IV.  FURTHER PROCEEDINGS

Because at least one claim will survive, the typical next step in a proposed class action such as this one is class certification proceedings.  However, even the surviving claim (GFFD) is in some doubt if Virginia law applies.  In the present circumstances, the Court finds that the parties should proceed to fact discovery regarding:

- where Flores's account "is located" for purposes of the Governing Law Clause;

- Bank of America's choice to notify eBanking account holders of the upcoming Core Checking conversion by way of, allegedly, a notice in only one bank statement;[11]

- any other notices Bank of America sent to eBanking account holders about the conversion to Core Checking.

Following discovery, Bank of America should move for summary judgment (and Flores may cross-move, if desired) on the following questions:

- Which state's law applies (if still disputed)?

---

[11] Bank of America is warned that this is not an invitation to be stingy in discovery responses, *e.g.*, to parse finely what counts as relevant specifically to the choice to include a notice in a statement as compared to other related choices.

- Does the applicable state's law recognize a claim for breach of the implied covenant of good faith and fair dealing of the type that Flores brings here?

- Assuming that breach of the implied covenant of good faith and fair dealing is a viable claim, does Flores have sufficient evidence from which a reasonable jury could find in her favor on that claim? (Or, in any cross-motion from Flores, could a reasonably jury *fail* to find a breach of the covenant of good faith and fair dealing?)

If Flores's claim survives this summary judgment procedure, the Court will then order the parties to proceed to the class certification phase.[12]

## V. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Bank of America's Motion to Dismiss Plaintiff's Complaint and, in the Alternative, Strike Class Allegations (ECF No. 8) is:

   a. GRANTED with prejudice as to Flores's claim for breach of contract,

   b. DENIED as to Flores's claim for breach of the covenant of good faith and fair dealing, to the extent the claim is based on Bank of America's decision to include notice within a bank statement;

   c. GRANTED with prejudice as to any other theory of breach of the covenant of good faith and fair dealing;

   d. GRANTED without prejudice as to Flores's claim for violation of the CCPA;

---

[12] For this reason, the Court need not now address Bank of America's alternative argument that Flores's nationwide class allegations should be stricken. (See ECF No. 8 at 13–15.) Bank of America may re-raise these arguments if and when it responds to a motion for class certification from Flores.

e.      GRANTED with prejudice as to Flores's claim for conversion;

f.      GRANTED without prejudice as to Flores's claim for unjust enrichment; and

g.      DENIED without prejudice as to Bank of America's argument that nationwide class allegations should be stricken;

2.      Flores's Motion for Leave to File Surreply ECF No. 22) is DENIED AS MOOT;

3.      The stay of discovery (ECF No. 33) is LIFTED; and

4.      No later than **June 17, 2019**, the parties shall jointly contact the chambers of U.S. Magistrate Judge Kristen L. Mix to begin the process of preparing a scheduling order consistent with Part IV of this Order.

Dated this 13th day of June, 2019.

BY THE COURT:

William J. Martinez
United States District Judge